## PEOPLES BANK OF SPRINGFIELD v. B. R. BROWN.

Middle Section. May, 1928.

Petition for Certiorari denied by Supreme Court, December 23, 1928.

282

W. A. Guild, of Nashville, for appellant.
True & Dorsey, of Springfield, for appellee.

HEISKELL, J. The original bill was filed in this case on January 4, 1924, by the Peoples Bank of Springfield against the defendant, B. R. Brown, seeking to recover upon a certain note for $3000 dated August 18, 1923, payable to the order of W. O. Moats four months after date, the said note being endorsed by said W. O. Moats. The said bill merely alleged that complainant was the purchaser for value of said note, without alleging that it was the holder in due course or stating the circumstances under which it acquired said note.

The defendant answered said bill on May 23, 1924, claiming in substance that said note was executed by him in the purchase of thirty shares of the Fly-Exit Screens Company's capital stock, said company being a foreign corporation, chartered under the laws of the State of Delaware, and that said corporation had not complied with the statutes and laws of the State of Tennessee relative to filing copy of its charter with the Secretary of State, as a condition precedent to doing business in Tennessee, and that it had failed to comply with the Blue-Sky Statutes of Tennessee as a condition precedent to its sale of its corporate stock in Tennessee; and that accordingly the said note or transaction was unenforceable. Defendant also claimed that the said stock was at the time worthless, and that said note was fraudulently obtained from him by the said Moats, president and directing head of the said company.

The defendant denied that complainant bank was an innocent holder for value of the said note, and alleged that complainant merely took the said note as collateral to an obligation of J. O. Draughon, in a fraudulent scheme between complainant and said Draughon and Moats to defeat defendant in his said defenses and equities against said note, and that complainant's possession of said note was therefore wrongful and fraudulent. The defendant filed

the said answer as a cross-bill making said J. O. Draughon and W. O. Moats parties defendant, and alleging in substance that at the time of execution of said note they were stockholders in said company and liable as partners therein, on account of said company's non-compliance with the Domestication and Blue-Sky Statutes of Tennessee. The defendant accordingly prayed that the said note be declared fraudulent, void and uncollectible, and that his said purchase of said stock be rescinded and the said note cancelled. The defendant prayed in the alternative that if complainant should be held to be the holder in due course of said note any recovery by complainant should be paid by the said W. O. Moats and J. O. Draughon, and that judgment therefor be accordingly rendered over against said W. O. Moats and J. O. Draughon in favor of the defendant. (cross-complainant).

The defendant W. O. Moats answered defendant's said cross-bill by making general denials of the allegations, and claiming that the note in question was executed for his personal accommodation.

Complainant Bank answered defendant's said cross-bill, denying that it had any knowledge of any transaction between the defendant and W. O. Moats, and denied that it knew that said Brown note was without consideration. It also denied that it was connected in any way with the alleged fraudulent stockselling scheme of the said Moats, or that it had any knowledge of such fraud or the worthlessness of the stock for which the said note was executed. Said bank alleged that it took said note as collateral security to a note of said J. O. Draughon, before said note came due, and that it accordingly became the holder thereof in due course.

On December 22, 1924, the said J. O. Draughon answered the cross-bill filed against him, the bank and Moats by Brown.

He admitted that Brown executed the note in question, and stated that the note was payable to order and recited that it was executed for value received. He stated that he did not admit that said note was not executed for value or that it was fraudulently obtained; that as to how this was he did not know.

That he did not know what representations were made by Moats to Brown to secure said note or for what said note was executed, but that he did not admit any of the allegations of what representations were made by Moats to Brown or that said note was given for stock or that no stock was issued to Brown for said note or that Brown notified Moats he did not want any of the stock.

Draughon then showed that he, himself, was at the time a stockholder in said company, that he thought it was all right in every respect and had done all that it should do as to incorporating, qualifying, etc., and that it had a bright future, all based on what Moats had told him about it.

That Moats came to him with the note in question, stating that the maker, Brown, lived in Sumner county and was unknown to the Peoples Bank and requested him, Draughon, to execute his note for $3000, due five months after date and he could sell Draughon's note to the said bank and as the Brown note was due in four months that would give ample time in which to collect the Brown note and thus meet Draughon's note; that it was represented to him that Brown was good and solvent, and he believed it, and wanted to help the company out; believed it was all right and had good prospects but was in need of ready money, and thereupon he executed his note for the Brown note and that his note was sold to the bank with Brown's note behind it as collateral; that when Brown's note came due and was not paid that he renewed the note he had executed to Moats and which had been sold to the bank by making his note payable direct to the bank, and renewed this renewal which last was placed with the American National Bank as security to the Peoples Bank's indebtedness to said American, this suit in the meantime having been brought on the Brown note, and that said American National Bank at this time holds his, Draughon's said note.

That at the time he took said Brown note he believed the said Brown had executed the same in good faith and for value, and that he, Draughon, became the holder thereof in due course before maturity for value, and averring that he was entitled to have said Brown note collected and the proceeds thereof applied to the payment of his said note then held by the American National Bank.

Draughon showed in his answer that he was a farmer, sixty-nine years of age, had lived all his life on the farm; that he was not a director in said company as the cross-bill charged, but had been informed he had been elected a director and he then resigned immediately, for he knew nothing about the manufacturing business and lived too far away to serve; that he knew nothing about the affairs of the company and all that he had ever done was to buy stock in it and loan money for its benefit, and that he thought the company was all right in every respect at the time he took Brown's note.

Respondent stated in his answer that he was simply a stockholder in the company just as was Mr. Brown.

Draughon expressly denied that he had any knowledge of any kind or character of any infirmity in said Brown note, and he stated that he did not admit there were infirmities in it.

The said Draughon then pleaded estoppel in two respects: First, that Brown himself being a stockholder in said company and having executed this note as he did thus causing him, Draughon, to execute his note, that Brown is estopped to call in question any

infirmity in said note or to refuse to pay the same; second, that by reason of said premises that the said Brown is estopped to plead as a defense the fact that said company was not domesticated or had not complied with the Blue Sky Law or that he, Draughon, was to be held a partner in said company with Moats.

The said Draughon did not admit that said company had not domesticated or had not complied with the Blue Sky Law.

He also denied that said Peoples Bank knew of any infirmity in said note; he denied that said bank took said note in payment of any pre-existing indebtedness or that said bank was simply carrying out a fraudulent scheme between him and Moats to collect said note from Brown and defeat him in his equities.

On May 8, 1925, the said J. O. Draughon filed his cross-bill against the said B. R. Brown showing that since the suit was instituted and since he had answered Brown's cross-bill that he had paid the renewal of the note executed by him for judgment in this cause on the Brown note.

In his cross-bill Draughon digested the pleadings theretofore filed, set forth the allegations of his answer and re-alleged them in the cross-bill, and made his said answer a part of the cross-bill.

He alleged that he became the owner of said Brown note before its maturity for value and without notice or knowledge of any kind or character of any infirmity therein and that he is a holder in due course.

On May 8, 1925, by permission Draughon amended his answer to Brown's cross-bill and his own cross-bill, but the amendment is not material.

On September 12, 1925, Brown answered Draughon's cross-bill, denying that Draughon was a holder in due course of the note, but admitting, by supposition, that Draughon had paid the bank the note Draughon executed, but averring that Draughon's payment was nothing more than Draughon's recognition of liability as subsequent guarantor or surety on the Brown note to the bank, and that such payment by Draughon was in furtherance of "the fraudulent scheme, plan and business of the said W. O. Moats, J. O. Draughon, the Universal Fly-Exit Screens Co., and others in the promotion of said company, in the sale of worthless stock therein, in the conduct of said company's business, and in the negotiation of notes executed therefor;" that said Draughon was a partner with Moats and others, or at least in the disposition of the note in question, with full knowledge of the equities of Brown, and that the said Draughon's claim to have given value or to have been an innocent holder was but a pretense, etc.

He insinuated that Draughon was profiting greatly in the transaction and had not revealed how much, and that this was significant.

The answer averred that Draughon was one of the active partici-
pants in the conduct of the company's business, was a partner
with Moats and others, and to be considered in no sense an inno-
cent holder.

He also pleaded failure to register charter and to comply with
the Blue Sky Law.

The court rendered a decree in favor of Draughon for the amount
of said note with interest and attorney's fees, holding that Draughon
was the innocent holder and owner of said note for value and that
he was guilty of no fraud or bad faith. From this decree Brown
has appealed and assigned errors.

There are fifteen assignments of error, but when the brief for
Brown comes to the argument it says this:

> "We deem it unnecessary to discuss the several assignments
> of error separately, because the Chancellor's decree is mani-
> festly erroneous, in that it is based upon at least three errone-
> ous grounds, to-wit: (1) That the note in question was not
> executed for the Universal Fly-Exit Screens Company's capital
> stock, but was executed for the accommodation of W. O. Moats
> individually; (2) that Brown's said general creditors' bill filed
> on July 16, 1924, (about two months after Brown's cross-bill
> in the pending case was filed) against the said company and
> others, amounted to an estoppel from asserting his claim or
> contention relative to the illegality of the execution of the note
> in question, on account of said company's failure to comply
> with the Domestication and Blue-Sky Statutes of Tennessee
> and (3) that Draughon in the transaction with W. O. Moats
> and the Peoples Bank of Springfield, involving the note in
> question, was a bona-fide purchaser and holder for value, in
> due course, etc., of the said note."

The condensation of the assignments is helpful although counsel
on neither side adhere to it strictly.

We think the court was correct in holding that this $3000 note
signed by B. R. Brown on August 18, 1923, payable to W. O.
Moats was not given for stock in the Fly-Exit Screens Company
but as an accommodation to Moats, in the nature of a loan, to en-
able him to raise money.

Brown had before this subscribed for $4000 of stock and had re-
ceived the stock. He admits that he received no stock when he
gave this $3000 note. On August 5, 1923, he executed two notes for
$1500 each, which he admits were an accommodation to Moats to
enable him to raise money. He also executed a note to Hutchison
not for purchase of stock. Asked by his counsel why he executed
the $3000-note in question, he says:

". . . he told me when I issued it that I would never have to pay it, that he had a man that would take up these notes, who had plenty of money and was backing the company with all of his might.

"Q. Who was that man that he claimed to be doing this? A. I think he said it was a Mr. Draughon.

"Q. Did you afterwards learn that this Mr. Draughon, the defendant J. O. Draughon in this cause claimed to have held the note? A. Yes, sir."

An excerpt from his cross-examination reads:

"Q. And you were a satisfied stockholder? A. I never considered myself a stockholder.

"Q. You never did? A. Oh, no, I never had any stock except this four thousand dollars under this contract.

"Q. You were holding stock in this company? A. I could release it at any time.

"Q. The stock had been issued to you? A. Yes, sir, I could return it and get dollar for dollar if I was dissatisfied one way or the other.

"Q. Now in regard to these notes which you subsequently gave; you didn't receive any stock on them? A. No sir.

"Q. They were not a stock transaction? A. I never received any stock.

"Q. Well, were they stock transactions? A. I would hardly consider them so.

"Q. They were more or less in the nature of advancements of money? A. Yes, sir.

"Q. You didn't advance this money to the Screens Co., did you, on these notes? A. I gave them my note for it, and they said they had men who would supply the money, and would never question me for collection.

"Q. You were not turning around and buying sixty more shares of stock of this company? A. How is that?

"Q. You didn't turn around and buy sixty more shares of stock in the company, when you were holding forty shares in it that you didn't think so much of? A. No, sir, these notes were more or less on the order of a loan.

"Q. Loan of money? A. Yes, I gave my note for the money, and they could use it as collateral."

Brown had never insisted that the two $1500 notes were other than a loan, so when he is asked about buying sixty more shares of stock, which would be $6000, it would seem that his answer referred to the $3000 note in question as well as the $1500 notes. Besides in answer to his own attorney asking about this $3000

note, he says that Moats told him when he signed the note that he would never have it to pay. That is entirely consistent with what Moats says. That the note was given as a loan of Brown's credit to enable him (Moats) to raise money. It is entirely inconsistent with the theory that the note was given in the purchase of stock, for in that case he would expect to pay the note. It is true he says he wrote the next day calling off the trade for stock and demanding return of note, but if when he signed it Moats told him he would not have it to pay, it could mean only that it was given for the accommodation of Moats and that he would take up the note and return it to Brown.

At another place in his testimony he says: "He (Moats) only told me that he had a man that had plenty of money who would take over the note and who would never push me for it, because he knew the merits of the company and would not consider he was taking any risk." This indicates that Brown knew when he signed the note that Moats expected to raise money on it.

Moats testifies that Brown let him have the note in question just as he did the two $1500 notes to raise money on, with the understanding that if he concluded to do so he could take stock in the Fly-Exit Screens Company for the note. If he did not conclude to take stock, he (Moats) would take up the note wherever he had placed it, and return it. Presumably this was to be done when the note fell due. Brown says he wrote recalling the note the next day, that is August 19th. That he directed the letter to the address of Moats in Nashville. Moats received the note in Gallatin where Brown lived. He says Brown did not want him to discount the note in Gallatin, so he went to Springfield without returning to Nashville and on August 20, delivered the note to Draughon at Springfield before he received Brown's letter.

From the evidence referred to in the record, we think the Chancellor was justified in finding that the note was executed for the accommodation of Moats and not for the purchase of stock and this notwithstanding the testimony, in general terms, by Brown to the contrary.

But even if Brown understood he was giving this note for stock, the note was payable to W. O. Moats and Moats had stock, so if for stock, it is more reasonable to suppose it was to purchase stock from Moats than treasury stock from the company. If for the latter, the note would naturally be made payable to the company. If to purchase stock from Moats, it was a personal transaction and not a transaction with the company.

We do not care to discuss the second proposition in the argument for Brown that it was error to hold Brown estopped to question

the existence of the corporation by having filed a creditor's bill to wind it up, because we think this is not necessary to the determination of the case. The third contention is that it was error to hold that Draughon became a bona-fide purchaser and holder for value of the note in question.

The testimony of Moats on this point is that when he received the note from Brown and Brown requested him not to use it in Gallatin, that he took it to the bank in Springfield and could not handle it direct because Brown lived in another county. That he then went to Draughon and at his request Draughon executed a note for $3000 payable to him (Moats) and attached the Brown note as collateral. That he discounted this note of Draughon's at the bank and got the money. The Brown note was due in four months and Draughon made his to fall due in five months so the Brown note would mature first. After renewing his note twice Draughon paid it and took up the Brown note and thus the Peoples Bank of Springfield dropped out of the case. Draughon says when he executed his note payable to Moats it was for the accommodation of Moats and that he did not know or have any reason to believe that there was any fraud or failure of consideration connected with the execution of the Brown note, and that he did not know of any infirmity of any kind in said note. That he was assured that Brown was amply solvent. That he did not ask what the Brown note was given for, but only that it was good.

The testimony of Moats corroborates that of Draughon and this is not all. In the answer and cross-bill filed by Brown, he not only charged all kinds of fraud and misrepresentation against Moats, but that Draughon knew or should have known all the infirmities and vices of said note. That the transaction between Moats and Draughon was a fraudulent scheme to defraud defendant. That said Draughon was a stockholder and director in the Fly-Exit Screen Co., an agent with Moats in selling stock. That he knew all the frauds practiced by Moats in obtaining the note and that it was given for worthless stock. The answer and cross-bill is sworn to, but when it comes to the proof, Brown makes no attempt by his own testimony or that of any other witness to maintain the charges against Draughon. The only charge made out is that he is a stockholder just like Brown himself. He was not a director; he was not engaged in selling stock. He was a farmer, old like Brown, and like him given to buying stock and losing money thereby. There is no proof offered to meet the plea and proof of innocent purchaser for value in due course of trade. Brown offers no witness on this question but himself and when pressed on cross-examination he admits that he does not know a thing to support his allegations against the good faith of Draughon. All that can be said

against him from the record is that he had the same faith in Moats and his company that Brown had.

But it is contended for Brown that this was a transaction of a foreign corporation not domesticated in this State and therefore Moats and Draughon will be considered as partners and the knowledge of Moats will be imputed to Draughon. If as we think is shown this is a transaction personal to Moats, this contention has no application. But suppose it was a purchase of stock from the company by Brown, this is not the sort of a transaction with the corporation in which the stockholders will be treated as partners and the knowledge of one imputed to another. A transaction with the corporation as a manufacturer of screens would be doing business in the State without complying with Code, section 2546, but not the transaction involved in this case. Besides, if Draughon was to be considered a partner so would Brown, for he was a stockholder, and he would be in the position, according to his own contention, of buying worthless stock, knowing it to be worthless.

Taking this transaction most strongly according to defendant Brown's theory as a sale of stock by Moats to Brown, we do not think it can be considered doing business in the State within the purview of Code, section 2546. Lloyd Thomas Co. v. Grosvenor, 144 Tenn., 347; Amusement Co. v. Albert, 128 Tenn., 417.

The sort of case to which the rule is applicable that stockholders in a corporation doing business in this State without attempting to comply with the law in regard to domestication of foreign corporations will be considered as partners, is shown in Cunnyngham v. Shelby, 136 Tenn., 176. We do not think the rule can be applied to the facts of this case. Even in the case of a partnership, notice to the firm cannot affect a member thereof in his individual rights and interests disconnected from those of the firm. Bolling v. Anderson, 4 Bax., 550.

The sale of stock in corporations is regulated not by Code, section 2546, but by the Blue-Sky Law and it is contended that this law was not complied with and that this rendered the note void. The same replies made before to the contentions of Brown are in point here. The note in question was executed to Moats as a matter of accommodation and not for stock. If for stock, the note being payable to Moats, it is more reasonable to suppose he was selling his own stock rather than treasury stock of the company and there is nothing to show when and how Moats acquired his stock, presumably before he came to this State. The records of the Blue-Sky office show that at the time this note was executed the Screen Company had a permit to sell stock. And in the last place, Draughon was an innocent holder for value in due course

and therefore can recover even if the Blue-Sky law was not complied with.

"A bona-fide holder of negotiable paper executed as part of a transaction prohibited by statute, may generally enforce its collection except where the statute has expressly or by implication declared the paper void." Frazier v. Lafferty, 150 Tenn., 105.

This case holds that a note taken for stock by a corporation without compliance with the Blue-Sky law and transferred to an innocent holder is not affected by such noncompliance in the hands of the innocent holder.

But it is said for Brown that Draughon did not become the purchaser and owner of the note in question, owing to the way in which he handled the note with the Springfield Bank. This contention is not sound.

"If a promissory note, regular in form, is endorsed and discounted by the payee named therein, for his sole benefit, the maker having signed the note to lend the payee credit, and not having received any part of the proceeds thereof, the maker could be held liable by all subsequent holders exactly the same as if he had received the proceeds of the note himself and had issued it for his own benefit. He has assumed this liability, and it can be enforced by one knowing all the facts." Child's Suretyship and Guaranty, sec. 181, p. 365; See, also, 8 Corpus Juris, sec. 403, p. 255, sec. 455, p. 289.

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of making the instrument knew him to be only an accommodation party." Negotiable Instruments Law, Shannon's Code, sec. 3516a37.

This was the law in Tennessee prior to the passage of the Negotiable Instruments Law. Bank v. Johnson, 1 Swan, 232. And the accommodating party is liable though the note may be transferred in payment of or as security for existing debts. Kimbro v. Lytle, 10 Yerg., 417.

If it were at all material, something might be said in defense of Moats in this case. We think he was not so bad as painted by appellant. He was infatuated with the idea that in this screens company there was a fortune just around the corner for him and his associates, and he was willing to put up all he had and all he could get from his friends in order to reach it. He did not try to get away with any money as he might have done. He was trying

to make the company a success. Whether it failed because the idea of the screen that would turn out the fly that was in and keep out the outsider was not based upon sound fly psychology, or whether it failed for lack of capital or from want of capacity in management, we do not know. Larger dreams than this have failed from many diverse causes; have failed without dishonesty, yet failed utterly. This is not material except perhaps as a sort of background for the picture. Brown and Draughon both partook of Moats' intoxication, had faith in him and his scheme and waked up to face losses. As to the note in question one must suffer loss, and the maxim applies that it should fall upon him whose act or neglect occasioned the loss. Draughon says he would not have executed his note to accommodate Moats, but for the transfer to him of the Brown note. Brown put out paper absolutely negotiable on its face. Mr. Gibson after discussing the principles involved in the maxim says this:

"The maxim is often expressed thus: Where one of two persons must suffer loss by the acts or fraud of a third party, he who enabled that third party to occasion the loss, or to commit the fraud, ought to be the sufferer." Gibson, sec. 52.

It is insisted for appellant that he should be held liable for only the amount the Peoples Bank paid for Draughon's note. The bank bought Draughon's note and Draughon was obliged to pay the full amount of it with interest. If he is entitled to recover at all on the note in question, he is entitled to the full amount which the note obligated Brown to pay.

All assignments of error are overruled and the decree of the Chancellor is affirmed. Decree will go against B. R. Brown and his surety on the appeal bond for the amount of the decree in the court below, with interest and costs of the appeal.

Owen and Senter, JJ., concur.